Go ahead, Counsel. Thank you, Your Honor. Good morning, and may it please the Court. If Your Honors have any questions about standing, I'm happy to address those now. Otherwise, my plan was to proceed to the merits of our first round involving aid and cork. Could you just speak for about 30 seconds as to why there is standing here? Certainly, Your Honor. Your Honor, Appellee Oyster has had a series of litigations below, and in those litigations, it has made broad infringement allegations. In one example, they've accused products that fall within a specific technical standard. And so we submitted a declaration from our Senior Vice President that said, we have sold for years products that meet that technical standard. There are other examples in our briefing, but it's clear that based on their infringement allegations, it's covering products that we have sold into the market, at least according to their definition of what their infringement allegations are. So we reached out to them and said, if you'll covenant not to sue, we'll dismiss the appeals, but they never replied to us. We wrote to them again, they didn't reply. So this is in line with this Court's precedent where if you're selling products that might fall within an infringement allegation and the appellee will not agree to covenant not to sue, that confirms that the risk of liability is concrete and not conjectural or hypothetical. Counsel, this is Judge Wallach. I think you go a little too far in the gray brief when you say Oyster, I'm quoting you, Oyster knows that it intends to bring an infringement action against Lou Manum. That's just an inference from Oyster's failure to respond to your covenant not to sue letter, isn't it? That's right, Your Honor. I think we were trying to say what the inference was from their silence. We take that as they have an intention or at least there is a concrete risk that they will initiate an infringement suit. But you're not a mind reader, right? That's correct, Your Honor. So I can't speculate. All right then. Well, if I could just follow up on something, there are past lawsuits against other companies products. Are you saying that the infringement allegation is premised on those other products performing the technical or complying with the technical standard and that's the specific reason? Or are you just telling me it just so happens to comply with the technical standard and your product just so happens to comply with the technical standard? Well, what they've said, Your Honor, and for reference, I'm on in the joint appendix at 3152, they identify as falling within the accused products, products that fall within a specific technical standard, OIF, CFP2, ACO 1.0. And what our declarant said was we sell products that comply with that specific standard. We also have other evidence that based on what they've said in their complaints about what they view as accused products, it's possible that our products meet that definition as well. So it's really based on what they've said, if they believe is infringing is covered by the scope of the claims and coupled with their refusal to covenant not to sue. And we also brief the estoppel effect that could apply if we were sued, being subject to estoppel from the determination below. So, Your Honors, if there are no more questions about standing, I'd like to proceed to the cork. There's only two ways to get to the board's conclusion. And that's either a bodily incorporation analysis or by limiting cork to its preferred embodiment. And both of those, Your Honors, err by misapplying this court's obvious analysis. So taking a step back, we're dealing here with basic components that the 898 patent that issue here itself recognizes were well-known in the industry. We've submitted evidence that aid discloses all of the components of the challenge claim, except for the energy level detector in a box, which is taught by cork. The board's conclusion was that while petitioner may have explained why a person more in skill would be motivated to combine AIDS transceiver with cork detectors, it did not sufficiently explain why you would include AIDS 2 fibers in that combination. And again, this is error for two reasons. On the first, on the bodily incorporation, and Your Honor. Yes, Your Honor. This is Judge Waller. On page 54 of the blue brief, you argue the PTAB, quote, erring in concluding that cork does not teach or suggest claim 14's indicating a drop in amplitude limitation. Because if the PTAB had construed drop in amplitude according to its broadest reasonable interpretation, that it would have been clear that cork and Eddie disclosed that limitation. Does that mean that your argument concerning what cork and Eddie disclosed is contingent upon us accepting your claim construction argument? Your Honor, with respect to that limitation, because the board found that cork did not meet that limitation based on how it viewed the scope of the term drop in amplitude, then yes, our position is that was an error. They did not apply the broadest reasonable interpretation of that term. Instead, they elevated extrinsic evidence over the clear intrinsic evidence. And so if you properly look at the scope of that claim, and I can walk through that, Your Honor, if you would like, but if you look at the proper scope of that claim, it would clearly include cork detection of average amplitude or average intensity. So that's our position on that term. On page 64 of the red brief, Oyster says you improperly advance a specific construction of amplitude for the first time on appeal. If that's not correct, where in the record below did you advance a specific construction of amplitude? What happened, Your Honors, and I'll point to the record in one second, but as a background, what happened here is in our petition, we argued that cork met the drop in amplitude threshold indicating a drop in amplitude limitation because cork measures average power or average amplitude. And in their patent owner response, they said using this system for amplitude modulation would be meaningless because a drop in amplitude is not an indicator of a drop in energy. In other words, in an amplitude modulated signal, the amplitude rises and falls repeatedly as part of transmission of data. But the 898 requires that the energy level detector be able to detect a drop in amplitude. And the 898 is specifically clear, and this is in the modulated system. So in effect, what their argument in their patent owner response was, was this system, the 898 is limited to phase modulation because if the term can't include individual drops in amplitude, and it can't include average drops in amplitude, which is what we showed cork disclosed, then it can't work with amplitude modulation. So in our reply, and this is on appendix 483, we made the point. We made the point that the patent owner was improperly narrowing the scope of the term to exclude a drop in average amplitude. And so, and it was effectively limiting it to phase modulation. So we addressed their argument in our reply and made the position that it would, that the term would encompass cork because it does encompass average, measuring averages. And we pointed to the specification and expert testimony to support that position. So your honors, on returning to the cork and aid combination, number one, the board said at appendix 38, what they did was they looked at one figure of cork and they said, even after replacing the receivers and transmitters in that figure, corks figure four, with AIDS integrated transceiver from its two fiber embodiment, the device would still have a single bidirectional fiber at the fiber input output rather than two fibers. So in other words, if you incorporate AIDS transceiver into the structure shown in corks figure four, you would still have a bidirectional fiber at the input output. And inherently that assumes a bodily incorporation. Oh, you're into your rebuttal time. Okay, your honors, but I will, I'll rest one brief point before I do. The, our last ground cork and Roberts this is in our briefing, but it's clear for that ground that the board ignored the petition's reliance on AIDS express disclosure of a co-located transceiver and receiver and instead faulted petitioner for not showing motivation to buy the specific remotely located transceiver and transmitter and receiver of Roberts. So we think the board erred on that ground by focusing on the specific transmitter and receiver of Roberts rather than crediting our argument and our showing that he discloses a co-located transmitter and receiver. And with that, I will reserve the rest of my time. Okay. Thank you counsel. Mr. Helge. Good morning, your honors. My name is Wayne Helge appearing for oyster optics and may it please the court. Your honors, the board's decision confirming the patentability of the claims was not tainted by legal error and it was supported by substantial evidence. The momentum's main argument this morning is that the board conducted an improper bodily incorporation analysis, but in fact what the board did below healthy, this is judge Chen. Are you no longer disputing standing? Your honor, we believe that momentum came forward with its evidence late under Phygenics. We do believe that they were obligated to make a standing. We know this court's rules require a showing a jurisdictional statement. In addition, of course, your honor, Phygenics requires some early showing of evidence. Here, your honor. Speaking of roles, counsel, this is judge Wallace. You're familiar with circuit rule 27F? Yes, your honor. I recall that we did look into the appellate rules in terms of raising early motions to dismiss for lack of standing. Why didn't you raise your standing argument in an earlier motion to dismiss then? So, your honor, in this instance, as my opponent did mention, there was a subpoena issued from Oyster to Lumentum, I believe it was back in 2017, asking for a number of documents related to what Oyster had referred to as accused products. Now, those accused products related to a number of different patents. Where we have perhaps a dispute with Lumentum here is Lumentum did not respond to that subpoena, which would suggest that perhaps there's evidence, perhaps there isn't. But in terms of this situation, your honor, Lumentum had joined the, excuse me, they were actually a co-petitioner in the PTAT proceedings, and so we expected them fully to come forward with their evidence of standing with their opening brief, and it was only when they did, as your honor noted, we didn't file a motion to dismiss, although we did raise the issue in our opening brief, our responsive brief, your honor. Counsel, but you don't think there's waiver here under our court's rules, do you? Well, your honor, under this court's rules, we recognize that it is incumbent upon a party to come forward with its arguments and its evidence, if there is, for example, new evidence at the time, and I know Figenics identifies opening brief or in response to a motion to dismiss, and so here it would seem that Lumentum has waited longer than they should have. In essence, your honor, we believe that if there is a basis to disregard this evidence, it would be based on waiver. Although we recognize that the court needs to decide standing simply as a question of jurisdiction, and we recognize that there is evidence in the record now that has not been stricken. Your honor, moving on, if there are no other questions on that point, moving on to the issue of Lumentum's argument regarding the bodily incorporation argument, it's important here, we believe, to note that the board actually went out of its way not only to respond and Lumentum presented in its petition, but also those that presented in its reply, or in essence, the figures that it pointed to more heavily in its reply, like cork figure two, which is a unidirectional embodiment and not the bidirectional embodiment of cork's annotated figure four, which they emphasized heavily in their petition at page 25. This is appendix pages 197 and 198. Even in their oral argument, there were some additional combinations asserted by Lumentum, which the board recognized were asserted late, but addressed. Now, importantly, your honors, as Judge Wallach noted earlier, there is an issue here on the drop in amplitude limitation, and in addition, there is a question, even if aid and cork were to be combined in the manner presented by Lumentum, does it disclose all elements of the claims? And the answer here is no, as the board found. We addressed this in the red brief at page 50, and at page 63, these are headings dealing with the drop in amplitude limitation, your honor, and also the question of whether a combination of aid and cork, as presented by Lumentum, would have included separate unidirectional fibers. And this is addressed by the board at appendix pages 37 and 38, and the board recognizes, I think in this analysis, the board recognizes quite clearly, based on the evidence of record, cork, and also Lumentum's argument, that the aid reference does not teach a card. The cork reference does not teach a card. And so the only existence of a card in the record, really, is Lumentum's expert statement about placing these components on a card. Now, the claim at issue, claim 14, is directed to a transceiver card, and certain elements of that card require fiber input, fiber output for separate unidirectional fibers for transmission. Now, Mr. Helge, this is Judge Chen. I thought, doesn't 80 talk about the transmitter and receiver being co-located? It does, your honor. It talks about them being co-located on a chip. And so this, your honor, is exactly, I think, the point where... And so didn't the board rely on that and saying, okay, 80, therefore, does meet the limitation of requiring the transmitter and receiver to be on the same card, but nevertheless, that still doesn't necessarily disclose, the combination wouldn't necessarily disclose using two fibers over a single bidirectional fiber. Isn't that what the board's reasoning was? Well, I think you're absolutely correct, your honor, and I think here, appendix pages 37 and 38 are directly on... So, I guess I'm getting lost. Are you trying to now dispute during this oral argument whether the board got it right when it said that 80 does, in fact, teach the limitation of having the transmitter and receiver on the same card? Well, your honor, just to be clear, Oyster isn't disputing what the board said about co-location of a transmitter and receiver. But to be clear, I mean, that is on a chip and what... Well, I'm just getting a little confused because now we're getting into a territory that I don't remember being briefed and disputed. I understand, your honor. I think the important part here is the co-location of a transmitter and receiver on a chip is part of the claim, although the claim itself requires all of these recited components to be on a common transceiver card. And the showing for the transceiver card components, like the fiber input and fiber output, which really are more direct to, I think, the issue that the board or the court is dealing with today, your honor, is where is that fiber input and fiber output? And what the board said in appendix pages 37 and 38 is the arrangement of fiber at a chip, at the transceiver, at the transmitter and receiver of aid is not determinative about whether there will be a separate fiber input and fiber output located on the card. And that's where we get back to Cork's annotated figure four. Again, your honor, page 197 of the appendix, this is the analysis that Lumentum presented to the board. It was a configuration where aid's again, these specific pages, even where you have a two fiber embodiment of aid with this co-located transceiver, there still is no showing that that would yield a separate unidirectional fiber arrangement in the ultimate system and necessarily in that card. And your honor, I believe as we mentioned... Hold on, hold on. Wait a second. The claim requires two separate fibers, right? Correct, your honor. So I got lost when you were explaining the board's reasoning there. The board was explaining why the combination of Cork and aid wouldn't necessarily lead to a combination using two fibers, right? Well, I think it's more than that, your honor. It's not simply the question of whether it would yield a combination using two fibers, but whether it would yield a combination as claimed, namely a transceiver card having a separate fiber input and a separate fiber output. And what the board says in this relevant passage here, it says we will accept Lumentum's argument about aid. We will accept that there are co-located transmitter and receiver on a common chip with two fibers, aid's two fiber embodiment. And we're going to look at that and figure out whether that still yields a card with a separate fiber input and a separate fiber output. And what they said was the answer is no. The important part here, your honor, is we're looking at the claimed elements of a fiber input and a fiber output of a card, the transceiver card. And a chip is not necessarily the same as a card. I mean, there could be a chip on a card. I'm getting lost, Mr. Helginkin. What sentence or paragraph of the board decision are they, is the board talking about this sensitivity as a distinction between a chip and a card? Well, so your honor, I'm looking at the bottom of the final written decision, page 37. And what the board said here is further, petitioner Luz of Lumentum has not shown that even if an ordinarily skilled artisan were to use a transceiver from aid's two fiber embodiment, the ordinarily skilled artisan would have used aid's first and second optical fibers in that combination. And where they're going, what they... Okay, so they're talking here that aid teaches a transceiver, right? Correct, your honor, correct. And so you're today talking about this sensitivity between a chip and a card. Where do I see that in the board decision? Well, your honor, I think it's really, it's the viewpoint that the board is taking here is they're trying to figure out whether there would be separate fibers in the system for transmission and reception. And so as the board continues here, your honor, they do come back to the petition at page 25, which is appendix 197, cork annotated figure four, which shows a fiber input and a fiber output at the upper left-hand corner of that cork annotated figure four. Now you can see in that figure, if your honor were to turn to it, and I'm happy to wait if you'd like to, your honor, but I'm happy to keep going otherwise. If you turn to that, what you'll see is the, what Lumentum calls the fiber input and output is on this boundary of this defined card that they've presented in but that fiber input and output is quite a bit removed from the transceiver. And even cork itself has, if you go into sort of the microcosm of cork, I mean, cork does show different, you know, a switch and different splitters that can then feed a separate receiver and transmitter. But the idea here, and this is, I think appendix page 197 is really nice to show, when you drop in aids to fiber embodiment into that transmitter receiver block on cork, it doesn't change the fact that cork has a single fiber input output for bidirectional fiber for bidirectional communication. And that's what the board was... Okay, where did the board say all of that? Because I don't remember seeing it. Well, your honor, I think it's really in this page 37-38 when they do say here, about halfway down the first paragraph, your honor, on page 38, they say, as shown, petitioner identifies receiver 27, transmitter 26, and two 3 dB couplers as the receiver transmitters. And as shown, replacing those components, and I think they mean replacing those components with aids to fiber embodiments for a transmitter receiver, would not change the fiber input output in that device. And the fiber input and output, they're then referring up to that upper left-hand corner of cork's annotated figure four. What they're saying there is we're going to swap out, according with the petitioner's theory, we're going to swap out the transmitter and receiver and these 3 dB couplers in cork with aids to fiber embodiment. That does not change the fiber input output in that device, meaning in cork's annotated figure four. So, they're accepting here that aid does teach an integrated transceiver, and it does teach a two fiber embodiment. And even, and this is where we get to the conclusion of that first paragraph, your honor, even after replacing, making that replacement as petitioner proposed in their declaration, which appears at appendix pages 811 and 812, even once we take all of that evidence and consider it, you still only have a single bidirectional optical fiber at the fiber input output, rather than two optical fibers for connections of the transceiver card, as decided by claim 14. So, your honor, here I think, I think the board is saying, petitioner, we accept your argument. We're going to make the change that you're proposing. It's not a bodily incorporation argument. It's the argument you proposed, and we still don't get all features of the challenge claim in that combination. And additionally, your honor, I know my time is almost out here, but we also have at final, at the final written decision appendix pages 52 through about 57 or 58, we also have them recognizing that a single paragraph dealing with the drop in amplitude threshold issue, petitioner simply didn't make the case that amplitude and average amplitude are the same. And so, your honor, we don't think you need to reach the motivation question. There are a number of reasons why petitioner's arguments were faulty and insufficiently supported. And the board is supported by substantial evidence, your honor. Thank you. Any other questions from the other judges? Then your presentation is completed. Thank you, your honor. Okay. Counsel, give a little time on rebuttal. Thank you, your honors. On that, on this figure four point, you'll notice, I noticed my friend used terms like swap in and drop out H transceiver into that and the, the, the mistake here, the misconception here is that we were relying on corks fiber input output and saying, here's where the fiber input output of the claim of the claim limitation is. And you put H transceiver in there. That, that wasn't our theory. If you look at the preceding page, the immediately preceding sentence on appendix 196, we say cork discloses embodiments where the detector is incorporated into a device with both a transmitter and receiver. So, the energy level detector is incorporated into something with a transmitter and receiver. And we made clear in our petition, and this is in our brief where we point to in the petition where we walk through all the claim limitations, that for the fiber input output for the two fibers, we're expressly relying on aid. We're saying aid has a transmitter receiver with a fiber input and a fiber output. So, what we're saying here is this is what cork says about energy level detection. And you could, you can incorporate that energy level detection into something that already has a transmitter receiver. And that's clear again, when you go to the next page, which is appendix 198. And the first sentence of that paragraph, bottom paragraph is the proposed combination therefore includes a single card with cork's optical power detectors and each receiver, transmitter, and modulator. So, what we're saying is a person of ordinary skill bringing his knowledge of this art would come into here and know that, okay, aid has everything. Cork has, it teaches energy level detection. It shows you could incorporate that into something with a transmitter and receiver. Aid has the transmitter and receiver. This is well within a person's ordinary, a person's skills in the arts capability and would be motivated to do so because it would reduce the number of cards in the system, thereby reducing cost and complexity. That's also on appendix 198. Your honors, on the drop in amplitude issue, again, it's just, you can see by what we put on brief, the 898 expressly says you can use its system with amplitude modulated signals. And there's no dispute that you couldn't detect energy level detection with the repeated drops in amplitude that happened with an amplitude modulated signal. So, if it can't be individual drops in amplitude and it can't be average amplitude, which was our position below, then there's no way that you could use it with amplitude modulated signals. But if you look at the 898, at appendix 82, columns 4, 44 through 48, it says the transceiver of the present invention preferably operates in phase modulated mode, although conventional amplitude modulated transmitters and receivers may also be used. There's also a claim 18 on appendix 84, where it distinguishes amplitude and phase modulated signals. So, under BRI, our position is there's no substantial evidence that the board, plus this could be reviewed de novo because it's an issue of claim construction and it's fully supported by the intrinsic evidence. But at the very least, the board erred as a matter of claim construction by elevating extrinsic evidence, the patent owner's expert's testimony, over the clear weight of the intrinsic evidence. So, we think this is a clear error in claim construction. Your Honors, there's no other substantial evidence for the board's decision, the board's limitation of cork to just what they are brakes in it for transmitting. Really quick, cork expressly says that in addition to protection switching, you could use this for other important applications, including simply to provide performance information or to automatically control an alarm. That's exactly what the 898 is talking about when it talks about energy level detection. Thank you, Your Honor.